Affirmed
and Memorandum Opinion filed August 13, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00938-CR

____________

 

BRANDY BERGARA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 212th
District Court

Galveston County, Texas

Trial Court Cause No. 04CR0846

 



 

M E M O R A N D U M   O P I N I O N

Appellant, Brandy Bergara, appeals her
conviction for capital murder.  Tex. Penal Code Ann. ' ' 7.02(b),
12.31(b), 19.03(a)(2) (Vernon 2003).  We affirm.

Factual and Procedural Background








On October 11, 2002, shortly before
closing, a small number of patrons remained at Murphy=s on Main, a biker
bar in La Marque, Texas.  William ABill@ Cronk, his wife,
Tammy, and the complainant, Joe Morreale, were sitting at the table closest to
the door when two masked and armed men entered through the front door yelling
for everyone to get down on the floor.  Thinking it was an early Halloween
prank, the Cronks and the complainant remained seated.  One robber moved
quickly toward the bar, while the second remained near the door watching the
Cronks and the complainant.  The first robber moved to the bar where Jeanie
Collins, and her husband, David, were on the floor.  The first robber pressed
his gun to Jeanie=s head and told her to get the money out
of the register.  Jeanie did as she was told, got the money out of the
register, and then asked the robber if he wanted her to include the checks as
well.  He told her yes, and said they would throw them away later.  While this
was happening, two other patrons, Chuck Haynes and his girlfriend, crawled
along the floor and escaped out the bar=s back door.  As
they were exiting the bar, they heard a commotion and then the sound of
gunfire.

At some point, the second robber turned
away from Bill, Tammy, and the complainant, and toward the robber getting the
money from the register.  Bill got up and moved behind a small wall out of the
second robber=s sight.  Bill could not see the second robber, but he
could see the complainant still seated at the table.  Bill testified he could
tell by reading the complainant=s face that the second robber had noticed
he was missing and was coming toward him.  Bill then jumped from behind the
wall and began struggling with the second robber in an effort to keep the gun
pointed into the air.  Within a few seconds, Bill heard two gunshots and then
the first robber moved to join the struggle.  Bill was hit on the head and fell
against the wall and another shot went off close to Bill and hit the wall over
his right shoulder.  The struggle continued and Bill had one of the robbers by
the throat when he was hit in the throat and knocked down on a couch next to
the front door.  The robbers then moved to leave and as the first opened the
door, Bill was able to kick it into both robbers as they exited, forcing one of
the robbers to drop his gun.  The police later recovered a Lama .45 caliber
pistol from the floor of the bar.








Tammy Cronk testified that while Bill
struggled with the second gunman, the complainant picked up a metal chair with
a cushioned seat and rushed at the first robber.  The first robber saw the
complainant and fired two quick shots, hitting the complainant.  On
cross-examination, Tammy admitted that in her statement she gave to the police
soon after the shooting, she said she did not see the complainant get shot and
did not know who shot him.  Tammy testified that shortly before the trial A[she] remembered
exactly where I was sitting.  I remember what happened. And like it all came
back to me.@ 

After escaping from the bar, Charles AChuck@ Haynes
encountered Wayne Rensch, the owner of the bar, outside Wayne=s trailer behind
the bar.  A bar employee had run out of the bar immediately after the robbers
entered and had run to Wayne=s trailer and told him the bar was being
robbed.  Wayne grabbed a handgun and the trailer=s telephone and
exited his trailer and dialed 9-1-1, he then heard gunshots from inside the
bar.  Chuck came up, took the handgun from Wayne, saw the robbers run out of
the bar, heard another gunshot, pursued the robbers, and fired numerous shots
at them.  The robbers took more than $700 from the bar=s cash register.

After the robbers left the bar, Bill saw
the complainant had been shot and was lying on the floor.  David Collins
attempted to perform CPR on the complainant.  He stopped when he realized he
was pumping the blood out of the complainant and there was nothing they could
do to help him.  The police and an ambulance arrived at the bar within
minutes.  The ambulance took the complainant to Mainland Hospital where he was
pronounced dead.








The Galveston County Medical Examiner=s Office conducted
an autopsy.  Dr. Stephen Pustilinik testified the complainant suffered three
gunshot wounds.  According to Dr. Pustilinik, one bullet went through the
complainant=s right arm and then traveled into the complainant=s chest and then
out of his back, causing fatal injuries.  A .45 caliber bullet was recovered
from the complainant=s clothes at Mainland Hospital.  Dr.
Pustilinik also testified that a second bullet hit an object, causing it to
split before entering the complainant=s chest in two
pieces, each piece then causing severe injuries.  Each piece of this .45
caliber bullet was recovered from the complainant=s body during the
autopsy.  According to Dr. Pustilinik, each of the three gunshot wounds was
independently fatal.

Following the autopsy, and a full day
after the robbery, the police and some of the bar=s patrons returned
to the bar in an effort to locate whatever caused the bullet to split.  The
police found no evidence of a ricochet, but did find a metal chair with metal
springs under the seat cushion.  There was a hole through the chair and a
spring protruding through the hole.  Wayne Rensch testified the chair was his,
and there was not a hole in the chair prior to the shooting.  The chair was
near the complainant after the shooting.  Both the State=s and appellant=s firearms experts
testified that the hole could have been made by a .45 caliber bullet.








Months after the robbery and murder, the
La Marque Police Department received a Crime Stoppers tip that led them to
interview appellant and Amador Sanchez.  La Marque police detectives eventually
interviewed appellant twice.  The second interview occurred on March 29, 2004. 
The second interview was videotaped and played for the jury and admitted into
evidence as State=s Exhibit 19.  Appellant initially told
the detectives she drove Sanchez and Scott Copeland to a house where they were
supposed to get appellant drugs and that she did not know anything about
robbing a bar.  However, after being confronted with inconsistencies in her
story, appellant admitted knowing about the planned robbery of Murphy=s on Main. 
According to appellant, Sanchez told her he knew a place they could rob and
make some money.  Sanchez told appellant he would pay her $200 if she drove the
car to accomplish  the robbery.  Initially appellant was not interested;
however, after her car was repossessed, she agreed.  About a week before the
robbery, Sanchez took appellant to show appellant the bar and show her where
she would have to go.  The night of October 11, 2002, appellant called Sanchez
and asked if they were going to do the robbery.  Sanchez said to come and get
him.  Appellant borrowed a car, picked up Sanchez and they drove by the bar to
make certain appellant knew where she was going.  They then picked up Scott
Copeland.  Appellant said the two men did not have anything in their hands
because everything was in their pockets.  In response to a question from one of
the detectives asking appellant if either man said where they got the guns,
appellant said Sanchez told her he already had them, that he had everything he
needed.  Prior to arriving at the bar, Sanchez and Copeland tied shirts up to
cover their heads.  In addition, Copeland wore a black hood over his head and
Sanchez wore a poncho and used a bandana-type object to cover his face.

Appellant dropped Sanchez and Copeland off
near the bar and pulled around the corner and parked to await their return. 
Appellant told the police she heard at least two gunshots and saw the two men
running back to the car.  When Sanchez and Copeland got back into the car, they
were both upset and screaming.  Sanchez told appellant he dropped his gun.  He
also told her there was fighting and he shot a man who was reaching for
something or coming toward him with something to fight.  After they returned to
Copeland=s girlfriend=s apartment,
Sanchez paid appellant $100.  When appellant confronted him about the short
payment, Sanchez explained he did not get that much money.  At the end of the
interview, appellant again admitted she knew about the robbery.

Following appellant=s arrest, James
Smith was appointed as her trial counsel.  On May 20, 2004, appellant was
indicted for capital murder and on June 11, 2004, Michael Charlton was
appointed as her lead defense counsel.  James Smith remained as her second
chair defense counsel.  In July, 2006, appellant agreed to a plea bargain where
she would plead guilty to the charge of aggravated robbery in exchange for
testifying against Scott Copeland.  In response to that plea bargain, the trial
court granted a motion to amend appellant=s indictment to
charge her with aggravated robbery.  In December, 2006, at the request of appellant,
James Smith was dismissed as appellant=s attorney, and
Kelly Case was appointed in his place.  In February, 2007, appellant withdrew
her guilty plea and entered a plea of not guilty.  On April 12, 2007, appellant
was re-indicted on the charge of capital murder.








The trial court entered a docket control
order on May 22, 2007 setting appellant=s capital murder
trial for September 24, 2007.  On June 1, 2007 Mr. Case filed a motion for a
free copy of the transcript of Scott Copeland=s capital murder
trial.  The trial court granted the motion on June 29, 2007.  Also on June 1,
Mr. Case filed a motion requesting an increase in his rate of compensation. 
Among his arguments in support of his request for additional compensation were
the following: 

The Court=s failure to Order that counsel be
paid an appropriate rate per hour for representation of their client will
certainly deny BRANDY BERGARA her right to the effective assistance of
counsel.  This effectiveness will not come as a result of counsel=s failures, but will come as a
result of a failure to adequately pay for the defendant=s representation by experienced,
competent and qualified defense attorneys. United States v. Cronic, 466
U.S. 648 (1984).

On August 8, 2007, the trial court removed Mr.
Charlton as one of appellant=s attorneys.  More than a month later, on
September 14, 2007, the trial court appointed Mark Stevens as appellant=s second
attorney.  The trial court finally granted appellant=s motion for
additional compensation on September 19, 2007 and included Mr. Stevens in the
order as well.








In the final weeks before appellant=s trial began, Mr.
Case filed numerous motions.  Among them were three motions for continuance. 
The first motion was filed on September 5, 2007, and appellant listed two
reasons in support of her request for a continuance.  First, appellant asserted
she was entitled to a continuance because her trial counsel still had not
received a complete transcript of Copeland=s trial.  Next
appellant alleged she was entitled to a continuance because the trial court
still had not ruled on appellant=s motion to
increase her trial counsel=s rate of compensation.  During the
pre-trial hearing, Mr. Case told the court he had been getting portions of the
Copeland trial transcript and had received additional portions that day and he
may have received the complete transcript but he had not had an opportunity to
verify that.  The trial court, having granted appellant=s motion for
additional compensation for defense counsel, did not rule on appellant=s September 5th
continuance motion.  Appellant did not request a ruling, and did not raise the
issue of the transcript again as a basis for a continuance.

On September 17, 2007, appellant filed
another motion seeking a continuance because her defense team lacked a Ateam member in the
psychiatric field.@  Then, on September 24, 2007, appellant
filed a final motion for continuance asserting there was a gap in
representation on the charge of capital murder.  In conjunction with that final
motion for continuance, appellant filed a ANotice of Failure
to Appoint Counsel@ in which Mr. Case asserted he did not
represent appellant on a charge of capital murder, but was only appointed to
handle a charge of aggravated robbery.  The motion ended with a statement that
appellant was Awithout representation on her new charge of Capital
Murder@ and a request
that the trial court appoint her an attorney qualified to handle death penalty
cases in Galveston County with additional time to prepare for trial.  However,
during the hearing on the motion immediately before the trial commenced, Mr.
Case told the court he was qualified to handle a capital murder case and was in
fact, on the list of qualified counsel for Galveston County.  In addition, in
response to a direct question from the trial court asking AHave you been her
lawyer all these months getting prepared for this trial or not?@  Mr. Case
answered, AYes, I have been, Your Honor.@[1]  In addition, Mr.
Stevens, appellant=s second defense attorney, represented to
the trial court that if he was lead counsel, he would be ready to go to trial. 
The trial court never ruled on appellant=s September 17th
and 24th motions for continuance, appellant did not request rulings on the
motions, and appellant announced ready for trial.

The jury found appellant guilty of capital
murder.  The trial court assessed the automatic punishment of confinement for
life in the Institutional Division of the Texas Department of Criminal
Justice.  This appeal followed.

 








Discussion

Appellant raises nine issues on appeal.[2] 
In her first issue, appellant challenges the legal and factual sufficiency of
the evidence supporting her conviction.  In her second issue, appellant contends
her life sentence constitutes cruel and unusual punishment in violation of the
Eighth Amendment to the United States Constitution and Article 1, ' 13 of the Texas
Constitution.  In her third issue appellant asserts the trial court erred in
not appointing her second counsel as soon as practicable as required by article
26.052(e) of the Code of Criminal Procedure.  Next, appellant argues the trial
court erred when Mr. Stevens, her second attorney, did not have ten days to
prepare for trial.  Fifth, appellant contends the trial court erred when it did
not provide appellant a transcript of her co-conspirator=s trial.  Sixth,
appellant contends the trial court erred when it allegedly denied appellant=s motion for
real-time transcripts of her trial.  In her three remaining issues, appellant
contends her trial counsel was ineffective.  We address each issue in turn.

1.       Is the evidence legally and factually sufficient?

Within her first issue, appellant raises
three separate reasons why the evidence is insufficient to convict her of
capital murder.  First, appellant asserts there is insufficient evidence that
she should have reasonably anticipated the murder.  Next, appellant contends
there is insufficient evidence that the murder was committed with the intent
required for a capital murder conviction.  Finally, appellant argues the
evidence is insufficient because her confession was not corroborated at trial.

 

 








A.        The
standard of review.

In a legal sufficiency review, we view all
the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Salinas v. State, 163 S.W.3d
734, 737 (Tex. Crim. App. 2005).  The jury, as the sole judge of the
credibility of the witnesses, is free to believe or disbelieve all or part of a
witness= testimony.  Jones
v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  The jury may
reasonably infer facts from the evidence presented, credit the witnesses it
chooses to, disbelieve any or all of the evidence or testimony proffered, and
weigh the evidence as it sees fit.  Sharp v. State, 707 S.W.2d 611, 614
(Tex. Crim. App. 1986).  Reconciliation of conflicts in the evidence is within
the jury=s discretion, and
such conflicts alone will not call for reversal if there is enough credible
evidence to support a conviction.  Losada v. State, 721 S.W.2d 305, 309
(Tex. Crim. App. 1986).  An appellate court may not re-evaluate the weight and
credibility of the evidence produced at trial and in so doing substitute its
judgment for that of the fact finder.  King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000).  Inconsistencies in the evidence are resolved in favor
of the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App.
2000).    We do not engage in a second evaluation of the weight and credibility
of the evidence, but only ensure the jury reached a rational decision.  Muniz
v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris v. State,
164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).








In a factual sufficiency review, we
consider all the evidence in a neutral light.  Prible v. State, 175
S.W.3d 724, 730-31 (Tex. Crim. App. 2005).  The evidence may be factually
insufficient in two ways.  Id. at 731.  First, when considered by
itself, the evidence supporting the verdict may be so weak the verdict is
clearly wrong and manifestly unjust.  Id.  Second, where the evidence
both supports and contradicts the verdict, the contrary evidence may be strong
enough that the beyond-a-reasonable-doubt standard could not have been met. 
Id.  In conducting a factual sufficiency review, we must employ appropriate
deference so we do not substitute our judgment for that of the fact finder.  Jones
v. State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).  Our analysis must
consider the evidence appellant claims is most important in allegedly
undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App.  2003).

B.        Capital
murder as a conspirator.

A person commits the offense of capital murder if she
intentionally commits murder in the course of committing or attempting to
commit robbery.  Tex. Penal Code Ann.
' 19.03(a)(2).  A person commits
murder if she intentionally or knowingly causes the death of an individual.  Id.
at ' 19.02(b)(1).  A person commits a
robbery if, in the course of committing theft, and with the intent to obtain or
maintain control of the property, she intentionally or knowingly threatens or
places another in fear of imminent bodily injury or death.  Id. at ' 29.02(a)(2).  If, in the attempt to
carry out a conspiracy to commit one felony, another felony is committed by one
of the conspirators, all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed
in furtherance of the unlawful purpose and was one that should have been
anticipated as a result of the carrying out of the conspiracy.  Id. at ' 7.02(b).  A defendant in a capital
murder case may be convicted solely on a conspiracy theory of culpability
contained in the jury charge.  Love v. State, 199 S.W.3d 447, 452 (Tex.
App.CHouston [1st Dist.] 2006, pet. ref=d) (citing Fuller v. State,
827 S.W.2d 919, 932B33 (Tex. Crim. App. 1992)).  Therefore, the State is not
required to present evidence of a defendant=s intent to kill as long as the
evidence establishes that a felony was committed as a result of a conspiracy
and the murder should have been anticipated in carrying out the conspiracy to
commit the underlying felony.  Ruiz v. State, 579 S.W.2d 206, 209 (Tex.
Crim. App. 1979).

 








C.        Appellant
should have reasonably anticipated the murder.

Appellant, relying on her video statement, argues the
evidence is insufficient to establish that she should have anticipated the
murder because there was no evidence presented at trial that she knew Sanchez
and Copeland were armed prior to entering the bar.  Appellant further contends
that, in her video statement, she did not say that Sanchez or Copeland had guns
prior to the robbery, thus making the evidence insufficient to support the
conclusion she should have reasonably anticipated the murder.  We disagree.

Initially, it was undisputed at trial that a robbery occurred
at Murphys on Main the night of October 11, 2002 and the complainant was shot
and killed during the robbery by either Sanchez or Copeland.  In addition, the
jury viewed appellant=s entire statement.  In response to a question from one of
the detectives asking if Sanchez had mentioned where he got the guns used in
the robbery, the jury heard appellant say Sanchez told her he already had them
and had everything he needed for the robbery.  The jury also heard appellant
state, even though she did not see either Sanchez or Copeland holding a gun
prior to the robbery, that she had seen her boyfriend and others frequently
carry guns hidden in their clothes in the past and therefore was aware it was
possible Sanchez and Copeland were doing the same thing.  Finally, during her
statement, in response to questions about the circumstances leading up to the
robbery, appellant told the detectives conducting the interview that Ayou know if you=re going to drive someone there=s always a chance.@  From this testimony, the jury was
free to draw the reasonable inference that appellant knew Sanchez and Copeland
were armed the night they robbed Murphys.  Villani v. State, 116 S.W.3d
297, 303 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d).  We hold the evidence is legally
and factually sufficient that appellant should have reasonably anticipated the
murder.

 

 








D.        The
evidence of specific intent is legally and factually sufficient.

Appellant next contends the evidence that the murder of the
complainant was committed with specific intent as required for a capital murder
conviction is insufficient.  Here, appellant initially focuses on the testimony
of Tammy Cronk, the only trial witness who testified to actually witnessing the
shooting.  Appellant points out that, in her statement given to the police soon
after the murder, Tammy said she did not know who shot the complainant and did
not see the actual shooting and testified during appellant=s trial that she had only recently
remembered the details of the shooting.  Next, appellant focuses on the split
bullet and argues Athe evidence tends to show that the split in the bullet was
likely caused by the bullet ricocheting off of some other object.  This
strongly implies that the gun was not aimed directly at Joe Morreale when it
was fired thus negating the specific intent necessary for a capital murder
conviction.@

With regard to Tammy=s testimony, we begin by noting the
testimony of a single eye witness is sufficient to convict.  Aguilar v.
State, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971); Walker v. State,
180 S.W.3d 829, 832 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  Also, appellant=s argument contravenes the
well-established standard of review for a jury=s evaluation of the credibility of
the witnesses.  The jury is the exclusive judge of the credibility of the
witnesses and the weight to be given their testimony.  Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000).  Our evaluation of the sufficiency of the
evidence should not intrude upon the fact finder=s role as the sole
judge of the weight and credibility given to any witness=s testimony.  Cain
v. State, 958 S.W.2d 404, 408B09 (Tex. Crim.
App. 1997).  The jury is
free to believe any or all of the testimony of the State=s witnesses.  Cole v. State,
194 S.W.3d 538, 551 (Tex. App.CHouston [1st Dist.] 2006, pet. ref=d).  The jury heard Tammy Cronk=s testimony, considered the
inconsistencies, if any, and still determined appellant was guilty of capital
murder.








We turn now to appellant=s contention the physical evidence
suggests the split bullet was the result of a ricochet rather than its passage
through the bar owner=s chair.  Here, appellant argues the State=s firearms expert testified a .45
caliber bullet like those which struck and killed the complainant was too big
to fit through the hole in the chair.  However, we disagree the State=s firearms expert testified to that
effect.  Instead, he testified that a similar bullet stuck when he inserted it
into the hole in the chair.  He also testified that when inserting the similar
bullet he did not apply the same amount of pressure as a bullet fired from a
handgun and, Ain many cases when you have a bullet pass through an object, the diameter
of the hole left behind is slightly less than the diameter of the bullet that
passed through.@  In addition, appellant overlooks the testimony not only of
the State=s firearms expert, but also her own expert.  Both testified it was
possible that the .45 caliber bullet that split could have made the hole in the
bar owner=s chair and been split as a result of hitting one of the cushion=s springs.  Appellant also ignores
the testimony that the police searched for, but did not find, any evidence of a
ricochet.  While appellant=s theory of the case might have been the split bullet was
caused by a ricochet, it was the jury=s decision to resolve any conflicts
in the evidence and their decision is not manifestly unjust merely because the
jury resolved conflicting views of the evidence in favor of the State.  Cain,
958 S.W.2d at 410.  Finally, while appellant spends much time addressing the
split bullet, she does not mention the other bullet, the one that did not
strike anything before it entered the complainant=s body through his arm.  The medical
examiner testified the wound created by this bullet was independently fatal. 
We hold the evidence is legally and factually sufficient that the murder of the
complainant was committed with specific intent as required for a capital murder
conviction.

E.        Appellant=s confession was sufficiently
corroborated.

Last, appellant argues the evidence supporting her conviction
is insufficient because her confession was not corroborated at trial.  Once again,
we disagree.








The corpus delicti rule states that an
extrajudicial confession of wrongdoing, standing alone, is not sufficient to
support a conviction; there must be some evidence that a crime occurred.  Rocha
v. State, 16 S.W.3d 1, 4 (Tex. Crim. App. 2000).  The corpus delicti rule
is satisfied if some evidence exists outside of the confession which,
considered alone or in connection with the confession, shows that the crime
actually occurred.  Salazar v. State, 86 S.W.3d 640, 645 (Tex. Crim.
App. 2002).  The corroborating evidence does not have to connect appellant to
the crime.  Id. at 644B45; Emery v. State, 881 S.W.2d 702,
705 (Tex. Crim. App. 1994).  Once the corpus delicti requirements are met, a
confession to the crime is, by itself, sufficient evidence to support a
conviction.  Lane v. State, 933 S.W.2d 504, 507 (Tex. Crim. App. 1996). 
In a capital murder case, the corpus delicti requirement extends to both the
murder and the underlying offense, in this case, robbery.  Williams v. State,
958 S.W.2d 186, 190 (Tex. Crim. App. 1997).

The record of this case contains ample
evidence corroborating appellant=s confession. 
Numerous witnesses testified that on the night of October 11, 2002, two armed
and masked men entered Murphy=s on Main and ordered the patrons and
bartender to get on the floor.  Jeanie Collins testified that one of the
robbers forced her to remove the cash and checks from the cash register.  There was also testimony that a
struggle ensued between Bill Cronk and one of the robbers and that the other
robber fired two shots at and killed the complainant as he attempted to assist
Bill.  There was also testimony that one of the robbers dropped a .45 caliber
pistol as a result of the struggle with the bar patrons.  In addition, the
medical examiner testified the complainant suffered three gunshot wounds, two caused
by a single .45 caliber bullet which had split, and that each wound was
independently fatal.  Finally, there was testimony the robbers took more than
$700 from the bar that night.  This evidence meets the requirements of the
corpus delicti rule as it constitutes some evidence that the crime of capital
murder committed during the course of a robbery actually occurred.  Williams, 958 S.W.2d at
190.








We hold the evidence is legally and factually sufficient to
support appellant=s capital murder conviction.  We overrule appellant=s first issue.

2.         Is
appellant=s automatic life sentence constitutional?

In her second issue, appellant contends the automatic life
sentence for a non-death penalty capital murder conviction constitutes cruel
and unusual punishment in violation of the Eighth Amendment to the United
States Constitution and Article I, ' 13 of the Texas Constitution.  In
addition, appellant argues the life sentence violates her right to due process
since it was automatic upon conviction and did not allow for any accounting of
personal characteristics or mitigating factors.

A defendant found guilty of a capital felony in a case where
the State did not seek the death penalty Ashall@ be punished by imprisonment for
life.  Tex. Penal Code Ann. ' 12.31.  When this occurs, a trial
court must sentence the defendant to life imprisonment.  Tex. Code Crim. Proc.
Ann. art. 37.071 ' 1 (Vernon 2006).








In Cienfuegos v. State, a case involving a capital
murder conviction under the law of parties, the First Court of Appeals
addressed this very issue and after an extensive examination of non-death
penalty capital murder cases stated: ATexas courts have consistently held
that the life sentence required under section 12.31(a) of the Penal Code and
article 37.071 of the Code of Criminal Procedure is not unconstitutional as
cruel and unusual punishment under the Eighth Amendment and Article I, section
13 of the Texas Constitution.@  Cienfuegos v. State, 113 S.W.3d 481, 495 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d).  The First Court of Appeals then
went on to hold that, when a defendant has been convicted of capital murder
under section 7.02(b) of the Penal Code, the mandatory life sentence required
by section 12.31(a) of the Penal Code and article 37.071 of the Code of
Criminal Procedure does not constitute cruel or unusual punishment under either
the Eighth Amendment or Article I, section 13 of the Texas Constitution.  Id.
at 496.   We agree with the First Court of Appeals and hold appellant=s life sentence does not constitute
cruel and unusual punishment under either the Eighth Amendment to the United
States Constitution or Article I, section 13 of the Texas Constitution.

In her second constitutional argument, appellant contends her
mandatory life sentence violates her right to due process under the Fourteenth
Amendment to the United States Constitution.  We have addressed this argument
before.  In Laird v. State, we held the mandatory life sentence for
capital murder did not violate the defendant=s due process rights. Laird v.
State, 933 S.W.2d 707, 714B15 (Tex. App.CHouston [14th Dist.] 1996, pet. ref=d).  Therefore, for the reasons
stated in Laird, we hold the mandatory life sentence required by section
12.31(a) of the Penal Code and article 37.071 of the Code of Criminal Procedure
does not violate appellant=s due process rights.  We overrule appellant=s second issue.

3.         Did
appellant waive her third issue on appeal?

In her third issue on appeal, appellant
contends the trial court violated article 26.052 of the Code of Criminal
Procedure because it did not appoint her second counsel as soon as
practicable.  See Tex. Code Crim. Proc. Ann. art. 26.052 (Vernon 2009) (providing that, in a capital
felony case, a trial court Ashall appoint two attorneys, at least one
of whom must be qualified under this chapter, to represent an indigent
defendant as soon as practicable after charges are filed, unless the state
gives notice in writing that the state will not seek the death penalty@).  In response,
the State asserts appellant waived this issue because she failed to preserve
the argument for appellate review.  We agree.








To preserve a complaint for appellate
review, a party must have presented to the trial court a timely request,
objection, or motion stating the specific grounds for the ruling desired.  Tex.
R. App. P. 33.1(a).  It is well-established
that almost every right, constitutional and statutory, may be waived by failing
to object.  Smith v. State, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); see
also Rhoades v. State, 934 S.W.2d 113, 119B20 (Tex. Crim.
App. 1996) (waiver of rights under Texas Constitution); Curry v. State,
910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (waiver of rights under United
States Constitution); Wissinger v. State, 702 S.W.2d 261, 265 (Tex. App.CHouston [1st
Dist.] 1985, pet. ref=d) (waiver of due process claim).

With regard to the alleged violation of
article 26.052, during the approximately thirty day period when appellant was
without a second appointed defense attorney, she never objected or otherwise
raised this issue with the trial court; therefore this issue is not preserved for appellate review. 
We overrule appellant=s third issue on appeal.  See Wright v. State, 28
S.W.3d 526, 530 (Tex. Crim. App. 2000) (stating a criminal defendant can waive
complaint regarding the procedures used to appoint counsel by failing to
preserve the issue in the trial court).

4.         Was
appellant harmed by the timing of the appointment of her second defense
attorney?

In her fourth issue, appellant contends the trial court erred
when it appointed her second defense attorney on September 14, 2007, when her
trial was scheduled to start on September 24, 2007.  While the record does not
show exactly when Mr. Stevens received actual notice of his appointment,
appellant contends it had to be less than the required ten full days of
preparation time because the appointment was not entered by the trial court
until the morning of September 14, 2007; thus, the appointment violated article
1.051(e) of the Code of Criminal Procedure.[3] 
Appellant also argues this alleged error is not subject to a harm analysis.








We disagree with appellant that a violation of article
1.051(e) is not subject to a harmless error analysis under Rule 44.2 of the
Texas Rules of Appellate Procedure.  While the Court of Criminal Appeals did
hold in Marin v. State, 851 S.W.2d 275, 281 (Tex. Crim. App. 1993), that
a violation of article 1.051(e) was not subject to a harm analysis, that
holding has since been overruled.  See Cain v. State, 947 S.W.2d 262,
264 (Tex. Crim. App. 1997) (holding that all errors, except certain federal
constitutional errors labeled as Astructural@ by the United States Supreme Court,
are subject to a harm analysis); Rivera v. State, 123 S.W.3d 21, 32
(Tex. App.CHouston [1st Dist.] 2003, pet. ref=d).  Therefore, we hold a violation
of the article 1.051(e) requirement that appointed counsel have ten days of
preparation time prior to trial is subject to a harm analysis under Rule
44.2(b) of the Texas Rules of Appellate Procedure.  

Assuming without deciding this action by the trial court
violated article 1.051(e), we hold the error was harmless.  Here, there is no
question appellant=s lead attorney, Mr. Case, had months to prepare for trial. 
Also, the trial court appointed Mr. Stevens, appellant=s second attorney, on September 14,
2007.  Mr. Stevens appeared at, and participated in, the pre-trial hearing on
September 18, 2007, so we must conclude he received notice of his appointment
prior to that day.  In addition, on September 24, 2007, the day appellant=s trial started, Mr. Stevens
represented to the trial court that he was ready to go to trial and he went on
to play an integral role in appellant=s defense.  Because it was undisputed
that a robbery occurred, that the complainant was shot and killed during that
robbery, appellant confessed to participating in the robbery, and the
punishment was automatic, we cannot conclude that three additional days of
preparation time for Mr. Stevens would have affected appellant=s defense and the outcome of the
trial.  We conclude the error was harmless.  Rivera, 123 S.W.3d at 32.

 








5.         Did
appellant fail to preserve her fifth and sixth issues on appeal dealing with
transcripts?

In her fifth issue, appellant contends the
trial court violated her equal protection rights when it did not provide her
with a free transcript of Scott Copeland=s capital murder
trial.  Here, appellant
did file a motion with the trial court requesting a free copy of the Copeland
transcript, which the trial court granted.  In addition, appellant filed a
motion for continuance in which she asserted one reason she needed the
continuance was the fact her trial counsel had still not received the entire
transcript.  We therefore construe appellant=s fifth issue as asserting the trial
court violated appellant=s equal protection rights when it denied her motion for
continuance based on allegedly not receiving a complete transcript of Copeland=s trial.  In her sixth issue,
appellant complains the trial court erred when it denied her motion to receive
real-time transcripts of the testimony during her trial.  Because they raise
similar issues, we address them together.








During the pre-trial conference one week before the start of
the trial, appellant=s defense counsel brought up the issue of the Copeland trial
transcript.  Counsel informed the court he had received portions of the
transcript and had received additional portions that day but he had not
had time to verify whether he had the complete transcript.  The trial court did
not rule on appellant=s motion for continuance, appellant did
not request a ruling, and in fact, did not raise the issue of the transcript
again, even during the discussions of his later filed motion for continuance
based on other grounds on the first day of trial.[4] 
Appellant also filed a motion to receive real-time trial transcripts.  The cost
and technical issues involved in such a request were discussed during the
pre-trial conference on September 18, 2007.  The trial court did not rule on
appellant=s motion for real-time transcripts, appellant did not
request a ruling, and did not raise the issue again.

To preserve a complaint for appellate
review, a party must have presented to the trial court a timely request,
objection, or motion stating the specific grounds for the ruling desired.  Tex.
R. App. P. 33.1(a).  Furthermore,
the trial court must have ruled on the request, objection, or motion, either
expressly or implicitly, or the complaining party must have objected to the
trial court=s refusal to rule.  Moore v. State, 278 S.W.3d
444, 451 (Tex. App.CHouston [14th Dist.] 2009, no pet.)
(citing Tex. R. App. P. 33.1(a)(2)
and Mendez v. State, 138 S.W.3d 334, 338 (Tex. Crim. App. 2004)).  As
discussed above, almost every right, constitutional and statutory, may be
waived by failing to object.  Here, while appellant brought the issues of the
Copeland trial transcript and the real-time trial transcript to the trial court=s attention, in
each case she failed to obtain a ruling and did not express an objection on the
trial court=s failure to rule.  Therefore, appellant failed to
preserve these issues for appellate review.  We overrule appellant=s fifth and sixth
issues.

6.       Did appellant receive ineffective assistance of
counsel?

In her seventh, eighth, and ninth issues,
appellant contends she received ineffective assistance of counsel because her
attorney (1) failed to obtain a psychological evaluation of appellant; (2)
failed to show appellant her video statement in a timely manner prior to trial;
and (3) was generally unprepared for trial and had neglected appellant=s case due to lack
of payment.  We address each contention in turn.

A.      The standard of review.








In reviewing claims of ineffective
assistance of counsel, we apply a two-prong test.  See Salinas v. State,
163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing Strickland v. Washington,
466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)).  To
establish ineffective assistance of counsel, appellant must prove by a
preponderance of the evidence that (1) her trial counsel=s representation
was deficient in that it fell below the standard of prevailing professional
norms, and (2) there is a reasonable probability that, but for counsel=s deficiency, the
result of the trial would have been different.  Id.  








An accused is entitled to reasonably
effective assistance of counsel.  King v. State, 649 S.W.2d 42, 44 (Tex.
Crim. App. 1983).  However, reasonably effective assistance of counsel does not
mean error-free representation.  Ex parte Felton, 815 S.W.2d 733, 735
(Tex. Crim. App. 1991).  When evaluating a claim of ineffective assistance, the
appellate court looks to the totality of the representation and the particular
circumstances of each case.  Thompson v. State, 9 S.W.3d 808, 813 (Tex.
Crim. App. 1999).  There is a strong presumption that counsel=s actions and
decisions were reasonably professional and were motivated by sound trial
strategy.  Salinas, 163 S.W.3d at 740; Stults v. State, 23 S.W.3d
198, 208 (Tex. App.CHouston [14th Dist.] 2000, pet. ref=d).  To overcome
the presumption of reasonable professional assistance, Aany allegation of
ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.@ Thompson,
9 S.W.3d at 814.  When determining the validity of an ineffective assistance of
counsel claim, any judicial review must be highly deferential to trial counsel
and avoid the deleterious effects of hindsight.  Ingham v. State, 679
S.W.2d 503, 509 (Tex. Crim. App. 1984).  When the record is silent as to the
reasons for counsel=s conduct, a finding that counsel was
ineffective would normally require impermissible speculation by the appellate
court.  Stults, 23 S.W.3d at 208.  Absent specific explanations for
counsel=s decisions, a
record on direct appeal will rarely contain sufficient information to evaluate
an ineffective assistance claim.  Bone v. State, 77 S.W.3d 828, 833
(Tex. Crim. App. 2002).  However, when no reasonable trial strategy could
justify trial counsel=s conduct, counsel=s performance
falls below an objective standard of reasonableness as a matter of law,
regardless of whether the record adequately reflects trial counsel=s subjective
reasons for acting as he did.   Andrews v. State, 159 S.W.3d 98, 102
(Tex. Crim. App. 2005).  If a criminal defendant can prove trial counsel=s performance was
deficient, he must still affirmatively prove he was prejudiced by counsel=s actions.  Thompson,
9 S.W.3d at 812.  This requires the defendant to demonstrate a reasonable
probability that the result of the proceeding would have been different if
trial counsel had acted professionally.  Id.  A reasonable probability
is a probability sufficient to undermine confidence in the outcome.  Mallett
v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). 

 B.     Appellant failed to demonstrate the result of
her trial would have been different if her trial counsel had obtained a
psychological examination of appellant.

Assuming without deciding appellant=s trial counsel=s performance was
deficient as a result of a failure to obtain a psychological evaluation of
appellant, we must decide if, as a result of that deficient performance, there
is a reasonable probability that, but for counsel=s deficient
performance, the result of the trial would have been different.  Salinas,
163 S.W.3d at 740.  In other words, we must determine whether there is a
probability sufficient to undermine confidence in the outcome.  Miller v.
State, 757 S.W.2d 880, 884 (Tex. App.CDallas 1988, pet.
ref=d).

Here, the evidence of appellant=s guilt is
overwhelming.  Appellant confessed to her involvement in planning and carrying
out the robbery that resulted in the complainant=s death.  Her
confession was fully corroborated.  The complainant=s murder was
foreseeable, a fact appellant admitted in her confession.  In addition, as the
State was not seeking the death penalty, once appellant was found guilty, her
punishment, confinement for life, was automatic.  Appellant has not
demonstrated a reasonable probability that, but for her trial counsel=s failure to
obtain a psychological evaluation of her, the result of the proceeding would
have been different.  We overrule appellant=s seventh issue.








C.      Appellant failed to demonstrate the
result of her trial would have been different if her trial counsel had shown
appellant her videotaped confession earlier than he did.

In her eighth issue on appeal, appellant
asserts her trial counsel=s performance was deficient because he did
not show appellant her videotaped confession in a timely manner. 

On September 24, 2007, prior to the start
of appellant=s trial, appellant=s trial counsel
informed the trial court, that, because of technical difficulties, he had not
yet been able to show appellant her videotaped confession.  Appellant=s counsel informed
the trial court he had reviewed the contents of her statement with her.  The
trial court ordered appellant=s counsel to show appellant her entire
statement during a recess, which he did.  Upon returning from that recess,
appellant was again offered a plea bargain of twenty-three years= in prison and she
would be eligible for parole in approximately seven years.  Even after viewing
her confession, appellant still rejected the plea bargain.  Appellant=s trial started
shortly thereafter.

Again, assuming without deciding appellant=s trial counsel=s performance was
deficient as a result of his failure to show appellant her confession sooner,
appellant, while spending a great deal of space in her brief arguing the
deficiencies of her counsel=s performance, has not demonstrated how
the result of her trial would have been different if her trial counsel had
shown her the confession sooner.  The State=s plea bargain was
still available after appellant viewed the confession and appellant still
rejected the deal in favor of going to trial.  We hold appellant has not met
the requirements of the second Strickland prong and overrule her eighth
issue.

 








         D.      Appellant did not
establish her trial counsel=s performance was
deficient because he ignored her case as a result of not being adequately
compensated.

In her ninth issue, appellant contends her trial counsel=s performance was deficient because
he ignored her case and failed to prepare because he was not being adequately
paid.  In
order to show ineffective assistance of counsel, appellant must first show that
her trial counsel's representation was deficient in that it fell below the
standard of prevailing professional norms. Salinas, 163 S.W.3d at 740. 
Here, appellant again points to her trial counsel=s failure to
obtain a psychological evaluation, his alleged failure to obtain the complete
Copeland trial transcript, his request for the appointment of a mitigation
specialist the morning of appellant=s trial, as well
as his argument there was a Agap@ in appellant=s representation
on the capital murder charge.








To overcome the presumption of reasonable
professional assistance, any allegation of ineffectiveness must be firmly
founded in the record and the record must affirmatively demonstrate the alleged
ineffectiveness.  Thompson, 9 S.W.3d at 813.  Appellant did not file a
motion for new trial.  In addition, her trial counsel was not afforded the
opportunity to explain his decisions or trial strategy.  Here, the record on
appeal does not support appellant=s contention that
her trial counsel ignored her case and was unprepared.  Trial counsel filed
numerous motions, vigorously cross-examined the State=s witnesses, and
located a firearms expert to counter the State=s firearms
expert.  In addition, appellant=s trial counsel=s tactics of
filing last minute motions for continuance, a request for a mitigation
specialist, and a notice of a gap in appellant=s representation
on the capital murder charge with suggestions he was not qualified to handle
that defense, indicate a strategy to try to force the State to change the
charge to aggravated robbery not because he was unprepared but because he was
aware of the strength of the State=s capital murder
case as well as his client=s unwillingness to accept a plea bargain. 
Therefore, we hold appellant did not prove, based on the record on appeal, that
her trial counsel=s performance fell below an objective
standard of prevailing, professional norms.  See Bone, 77 S.W.3d at 833;
Salinas, 163 S.W.3d at 740.  We overrule appellant=s ninth issue.

Conclusion

Having overruled all of appellant=s issues on
appeal, we affirm the judgment of the trial court.

 

 

 

 

/s/      John
S. Anderson

Justice

 

 

Panel consists of Justices
Anderson, Guzman, and Boyce.

Do Not Publish C Tex.
R. App. P. 47.2(b).

 

    

 

 









[1]  In addition, the trial court suggested appellant=s final motion for continuance was a Astunt to try to force [the prosecution] to change [the
charge] to aggravated robbery.@





[2]  Appellant initially raised ten issues.  However, her
tenth issue addressed a document missing from the Clerk=s Record.  A Supplemental Clerk=s Record containing the missing document was
eventually filed making appellant=s
tenth issue moot. 





[3]  In her brief, appellant argued the trial court=s failure to provide her second defense attorney a
full ten days to prepare for the trial violated Article 26.04(b) of the Code of
Criminal Procedure.  We construe this issue to argue the trial court=s failure to give her second attorney ten full days to
prepare violated article 1.051(e) of the Code of Criminal Procedure, the
article actually creating the requirement of ten days preparation time.





[4]  While we do not reach this issue, the record does
indicate appellant received the complete Copeland trial transcript.  On
September 24, 2007, while discussing appellant=s motion in limine, Mr. Stevens, appellant=s second attorney, informed the trial court: AWe reviewed the records of the prior trial, judge.  I=m referring to number 18.  And there was a tendency
for witnesses to characterize a person as a quote, unquote, >the shooter,=
without actually saying and apparently without actually seeing that they had
seen this person or that person fire weapons at anyone.@